WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Alan Nisselson, Chapter 7 Trustee*
156 West 56th Street
New York, New York 10019
(212) 237-1000
Attorneys appearing:  Alan Nisselson (anisselson@windelsmarx.com)
                     Leslie S. Barr (lbarr@windelsmarx.com)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                            :
                                                 :    Chapter 7
NY INNER CITY CHICKEN, INC.,                     :
a/k/a POPEYE'S CHICKEN,                          :    Case No. 1-09-40001 (JBR)
                                                 :
                    Debtor.                      :
------------------------------------------------------------x

## TRUSTEE'S REPORT OF SALE

**Transfer by Trustee of Substantially all of the Debtor's Assets to
850 Pennsylvania Avenue Chicken, Inc. ("Purchaser")
Purchase Price: $1,125,000 plus payment of all fees due the Franchisor, less certain credits
Closing Date: May 25, 2011**

This report summarizes the closing (the "**Closing**" or "**Transfer**") of the above referenced transaction, which took place on May 25, 2011 (the "**Closing Date**") at the offices of Windels Marx Lane & Mittendorf, LLP ("**Windels Marx**"), counsel to Alan Nisselson (the "**Trustee**" or "**Seller**"), chapter 7 trustee for the estate of NY Inner City Chicken, Inc., a/k/a Popeyes Chicken (the "**Debtor**"). The following parties attended or participated by telephone in the Closing, either in person or by their representatives, as follows:

| Party: | Represented By: |
|---|---|
| Alan Nisselson, trustee for the chapter 7 estate of NY Inner City Chicken, Inc., a/k/a Popeyes Chicken, Seller | Alan Nisselson, Esq.<br>Leslie S. Barr, Esq. and<br>Anna Cote, Legal Assistant<br>Windels Marx Lane & Mittendorf, LLP<br>156 West 56th Street<br>New York, New York 10019 |
|  |  |

{10645178:1}

| | |
|---|---|
| 850 Pennsylvania Avenue, LLC, Lessor<br>Majid ("Jerry") Kahen, Principal | James P. Pagano, Esq.<br>277 Broadway<br>New York, New York 10007 |
| Stanita Service Corp., former Lessor | Howard W. Rachlin, Esq.<br>11 Park Place, Suite 816<br>New York, New York 10007 |
| AFC Enterprises, Inc., Franchisor | John K. Rezac, Esq.<br>Taylor English Duma LLP<br>1600 Parkwood Circle, Suite 400<br>Atlanta, Georgia 30339 |
| Bank of America, N.A. | Daniel Flores, Esq.<br>Wilson Elser Moskowitz Edelman & Dicker LLP<br>150 East 42nd Street<br>New York, New York 10017 |
| Richard Maltz, V.P.<br>David R. Maltz & Co., Inc., auctioneers | 155 Terminal Drive<br>Plainview, New York 11803 |

## DESCRIPTION OF TRANSACTION

A.  Bankruptcy Case, Conversion and Appointment of Trustee.

1.  On January 2, 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the Eastern District of New York (the "**Court**").

2.  Until March 14, 2011, Debtor remained in possession of its property and continued to operate and manage its business as a Debtor-in-Possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3.  On February 23, 2011, the Court entered an Order to Show Cause why this case should not be dismissed, converted to one under chapter 7, or a chapter 11 trustee should not be appointed. [Docket No 146].

4.  In Response to the Order to Show Cause, on March 7, 2011, the United States Trustee for Region 2 (the "**U.S. Trustee**") filed a *Memorandum of Law in Support of Converting*

*this Chapter 11 Case to One under Chapter 7* [Docket No. 149].

5.     On March 14, 2011, the Court entered an Endorsed Order Converting Case from Chapter 11 to 7 for reasons set forth on the record. [Docket No. 153]. Also on March 14, 2011, the U.S. Trustee filed a notice appointing Alan Nisselson as Trustee [Docket No. 155].

6.     On March 17, 2011, the Trustee filed an Application to employ Windels Marx as attorneys for the Chapter 7 Trustee *nunc pro tunc* to March 14, 2011 and the Affidavit of Alan Nisselson in Support of the Application [Docket No. 158]. On March 23, 2011, the Court entered an Order Granting Application. [Docket No. 160].

B.     The Debtor's Business, Assets and Significant Obligations.

7.     The Debtor's principal business was to own and operate a Popeyes Restaurant Franchise (the "**Restaurant**") located at 850 Pennsylvania Avenue, Brooklyn, New York (the "**Premises**") pursuant to a Popeyes Chicken and Biscuit Franchise Agreement (the "**Franchise Agreement**") by and between the Debtor as franchisee, and AFC Enterprises, Inc. (the "**Franchisor**").

8.     The Debtor did not own the Premises on which the Restaurant was located. Rather, the Premises are leased from 850 Pennsylvania Avenue, LLC (the "**Lessor**"), as assignee of Stanita Service Corp., the prior lessor ("**Stanita**"), under the lease dated February 8, 1967, as extended from time to time, by and between the Debtor, as tenant, and the Lessor (the "**Lease**").

9.     Prior to the Petition Date, Bank of America, N.A. (the "**Bank**") extended credit to the Debtor, and holds first priority liens on and security interests in all of the Debtor's assets, including, without limitation, all of the Debtor's personal property, assets and proceeds, to secure the repayment of the Debtor's obligations to the Bank in the present approximate amount of $2,818,000.

C.    <u>The Sale</u>.

10.    Upon application of the Trustee, the Court entered an Order dated April 12, 2011 [Doc. No. 174] (the "**Maltz Retention Order**"), authorizing the Trustee to retain David R. Maltz & Co., Inc. ("**Maltz**", or the "**Auctioneers**") as his auctioneers for the purpose of marketing and conducting an auction sale of the Restaurant assets, including the Lease and the Franchise Agreement. Pursuant to the Maltz Retention Order, Maltz is entitled to payment of commissions and reimbursement of disbursements, as the Court may allow upon application, after notice and a hearing and under the U.S. Trustee Guidelines, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of this Court.

11.    The Auctioneers were instrumental in obtaining a letter agreement dated March 23, 2011, wherein the Trustee agreed to (a) accept an offer from Rahman Hashimi (the "**Second Purchaser**"), to purchase the Restaurant assets for the amount of $300,000 plus the payment of all fees to the Franchisor required to assume and assign the Franchise Agreement (the "**Franchise Cure Amount**") subject to higher or better offers, and (b) fix certain terms of sale and a break-up fee to the Purchaser if he was not the successful bidder, subject to Court approval (the "**Offer**"). The Second Purchaser delivered to the Trustee a deposit in the sum of $75,000 (the "**Second Purchaser Deposit**"). Copies of the Offer and the Second Purchaser Deposit are attached as **Exhibit A**.[1]

12.    On April 8, 2011, the Trustee served and filed his motion to sell the Restaurant assets under Bankruptcy Code section 363(b) and 365(b) titled: *Trustee's Motion for Entry of an Order (A) Authorizing the Trustee to Sell, Subject to Higher or Better Offers, Substantially All of the Debtor's Assets and Motion to Assume Lease and Assign the Lease of the Debtor's Premises and the Popeye's Chicken & Biscuits Franchise Agreement; (B) Approving the Stipulation and Order*

---

[1] Every effort has been made to redact personal and financial information from the exhibits filed with this Report.

*Between the Trustee and Bank of America Regarding Distribution of Sale Proceeds and Carve-Out Terms; and (C) Granting Other Related Relief* (the "**Sale Motion**") [Doc. No. 166]. The Sale Motion defined the Restaurant assets to be sold as (a) all of the Debtor's inventory, restaurant equipment, spare parts, permits, telephone numbers, fax numbers, and any other assets not defined in the Sale Motion as "Excluded Assets" (comprised of the Debtor's cash on hand and accounts receivable; any equipment subject to lease obligations or any other secured claims that the Lessor or secured creditor has not consented to sell; and all causes of action belonging to the Debtor's bankruptcy estate under chapter 5 of the Bankruptcy Code), and (b) the assumption and assignment of the Lease and the Franchise Agreement.

13. The Court thereafter scheduled (a) the Trustee's auction sale of the Restaurant assets (the "**Auction Sale**") to be held at the Court house on April 28, 2011 (the "**Sale Date**") at 10:00 a.m., and (b) a hearing immediately following the auction to consider the Sale Motion and the Trustee's sale of the Restaurant assets on the Sale Date at 11:00 a.m. (the "**Hearing**").

14. On or about April 12, 2011, the Trustee gave due notice (the "**Sale Notice**") to all creditors and parties in interest of the Auction Sale of the Restaurant assets pursuant to the Offer, subject to higher or better offers, at the Court house on the Sale Date. The Sale Notice welcomed higher or better offers and stipulated that the initial bid over and above the Offer must be in the minimum amount of $330,000 plus payment of the Franchise Cure Amount. The Sale Notice further stipulated that any bidder at the Auction Sale would be bound by the terms set forth in the Sale Notice, and by the Terms and Conditions of Sale, which stipulated, *inter alia*, that the Restaurant assets would be sold "AS IS", "WHERE IS", "WITH ALL FAULTS", and without recourse, and under the Bankruptcy Code, the conveyance of the Units was to be free and clear of all liens, claims, interests and encumbrances (collectively, the "**Encumbrances**"). The Sale Notice and the affidavit of service thereof are filed with the Court at Doc. No. 171.

15. Also on April 12, 2011, the Trustee gave due notice (the "**Hearing Notice**") to all creditors and parties in interest of the Hearing to consider the Sale Motion and approval of the proposed sale of the Restaurant assets for the highest or best offer. The Hearing Notice and the affidavit of service thereof are filed with the Court at Doc. Nos. 172 and 173.

16. On April 25, 2011, Stanita and the Lessor filed with the Court objections to the Sale Motion asserting, *inter alia*, that the Lease had been terminated before the Petition Date, was not revived and therefore could not be assumed and assigned by the Trustee. [Doc. Nos. 182 and 183].

17. Notwithstanding the objections filed by Stanita and the Lessor, the Trustee and his counsel Windels Marx, met with the Lessor and prospective bidders, engaged in numerous discussions and exchanges of email, and negotiated a resolution of the objections, whereby the Lessor and Stanita agreed to accept payment of the Lease arrears and to negotiate and enter into a new lease for the Premises with a successful bidder at the Auction who was acceptable to the Lessor, rather than to risk litigating the Trustee's ability to assume and assign the Lease.

18. On April 26, 2011, the Trustee filed a *Notice of Proposed Stipulation by and Between the Trustee and Bank of America, N.A. Regarding Distribution of Sale Proceeds and Carve-Out Terms*. The proposed Stipulation and Order provided, *inter alia*, that the Trustee distribute to the Bank the proceeds of the sale of the Restaurant assets, net of certain expenses and a carve out for the estate from the Bank's liens equal to 15% of that net sum (the "**Carve Out**"). [Doc. No. 186.]

19. On the Sale Date (April 28, 2011), the Trustee and Maltz conducted the Auction Sale of the Restaurant assets at the Court house. The Trustee selected the bid of Abdullah Sultany or his assignee or designee (the "**Purchaser**") as the highest or best bid for the Restaurant assets in the amount of $1,125,000.00 plus payment of the Franchise Cure Amount (the "**Purchase Price**"). The Trustee selected the Second Purchaser's bid of $1,100,000.00 plus payment of the Franchise Cure

Amount as the second highest or best bid made at the Auction. A copy of the Memorandum of Sale executed by the Second Purchaser is attached as **Exhibit B**.

20.     Immediately after the Auction Sale on the Sale Date, the Court held the Hearing and approved the Trustee's selections of the offer made by the Purchaser as the highest or best bid, and the offer made by the Second Purchaser as the next highest or best bid, subject to the execution and delivery by the Purchaser (or the Second Purchaser if applicable) of a new lease with the Lessor substantially on the terms and conditions agreed to by the parties on the record of the Hearing.

21.     At the conclusion of the Hearing, the Purchaser delivered a check to the Trustee in the amount of $33,000 as a deposit towards the Purchase Price. The Purchaser also executed a Memorandum of Sale acknowledging that he had reviewed, and would abide by, the Terms and Conditions of Sale. Under the Terms and Conditions of Sale, among other things, the Purchaser was obligated to consummate the transaction no later than five days after the Court enters an Order confirming the Auction Sale, Time Being of the Essence as to the Purchaser. Thereafter, the Purchaser delivered two additional checks to the Trustee in the aggregate amount of $79,500, which together with the first check in the amount of $33,000, constituted a good faith deposit equal to 10% of the Purchase Price (together, the "**Deposit**"). Copies of the Memorandum of Sale executed by the Purchaser and the Deposit checks are attached as **Exhibit C**.

22.     On May 23, 2011, the Court entered an *Order Authorizing Trustee's Sale of Substantially All of the Debtor's Assets Pursuant to Bankruptcy Code §§ 363(b)(1) and (f) and 365 Including Issuance of a New Lease and Assumption and Assignment of Franchise Agreement; and (B) Granting Other Related Relief* (the "**Sale Order**"). A copy of the Sale Order is attached to Exhibit D, the Closing Statement described below.

D.      The Closing.

23.     As set forth above and in the Closing Statement, the Closing was held on May 25,

2011. The transactions constituting the Closing are detailed in the Closing Statement, attached as **Exhibit D**. Copies of the closing documents and checks are attached to the Closing Statement and made a part of this Report of Sale. Following is a summary description of the documents, instruments and agreements delivered at the Closing that evidence the sale transaction:

(a) The Trustee delivered to the Purchaser a duly executed Bill of Sale, which transferred the Restaurant assets to the Purchaser, and a Transfer and Release Agreement by which the Franchise Agreement was assigned to Purchaser;

(b) Purchaser delivered to Lessor a duly executed new lease for the Premises, a Certificate of Liability Insurance, and a Guaranty to Lease;

(c) Purchaser delivered to Franchisor a duly executed Franchise Agreement, Amendment to Franchise Agreement, New York Amendment to Franchise Agreement, and a Guaranty and Subordination regarding the Franchise Agreement; and

(d) Purchaser delivered to the State of New York a Notification of Sale, Transfer or Assignment in Bulk. (*See* Exhibit D for copies of documents).

24. The Closing Report also reflects that the parties made certain adjustments and credits at the Closing. Among other things, the Purchasers received additional credits from various parties aggregating $51,689.34. Following is a brief description of those credits and related adjustments.

25. As described above, the Purchase Price was $1,125,000.00, plus the Franchise Cure Amount. The Franchisor asserted that the aggregate of the Franchise Cure Amount was the sum of $48,861.94. The Purchaser delivered a certified bank check to the Franchisor at the Closing in the amount of $43,498.94. At the Closing, the Franchisor granted to the Purchaser a credit in the sum of $5,000.00, which left a deficiency due from the Purchaser to the Franchisor in the amount of $363. To make up the difference, the Trustee issued a check to the Franchisor in the amount of $363

{10645178:1}                                        8

payable from the Deposit funds on hand, representing payment of a portion of a credit in the amount of $15,000.00 granted at the Closing by the Trustee to the Purchaser from the estate's portion of the Carve Out.

26.  As set forth in the Closing Statement, the total of additional credits granted by various parties to the Purchaser at the Closing was $51,689.34 (including the sums described above). These credits were granted because the Purchaser refused to close without them because it claimed that the personal property at the Premises had been rendered worthless and the reputation of the business had been damaged due to the failure of the refrigeration system and the consequent putrefaction of the poultry inventory before the Closing. The parties listed below each agreed to grant to Purchaser a credit as follows:

| | |
|---|---|
| Pennsylvania Avenue Management, LLC (Current Landlord) | $5,000.00 |
| Reserved from David R. Maltz & Co., Inc. (auctioneer) | $5,000.00 |
| AFC Enterprises, Inc. (Franchisor) | $5,000.00 |
| Trustee Carve Out | $15,000.00 |
| Bank of America | $22,052.34 |
| **Subtotal**: | **$52,052.34** |
| Minus shortfall due Franchisor | ($363.00) |
| **Total Additional Credits to Purchaser:** | **$51,689.34** |

27.  Because the Trustee closed the sale with the Purchaser, the Second Purchaser was entitled to a break up fee. The Sale Order approved the Second Purchaser's break up fee, calculated according to the terms and provisions of the Offer, at 5% of the amount that the Second Purchaser's bid at the Auction Sale. Because the Second Purchaser bid the sum of $1,100,000.00, the break up fee would have been $55,000.00. After the Auction Sale and Hearing, however, the Second Purchaser sought to compel the Trustee to close the sale of the Restaurant assets with him for a reduced purchase price of $700,000.00. The Second Purchaser alleged that the Purchaser lied about being an approved Popeyes franchisee, and reasoned that the Purchaser therefore should not have been a qualified bidder, thereby wrongfully causing the Second Purchaser to overbid after all other

bidders had dropped out at $700,000.00, and demanded that the Trustee close the sale with him for $700,000.00, rather than the $1,100,000.00 that he actually bid. Accordingly, the Trustee believed that the Second Purchaser breached his obligations under the Terms and Conditions of Sale and that it would have been inappropriate to pay the Second Purchaser a break-up fee equal to 5% of his full bid when he claimed that the bid was procured fraudulently and he was not going to close at that price. Accordingly, the Trustee agreed to pay the Second Purchaser 5% of the amount of the bid that he was willing to pay, i.e., $700,000.00. The Second Purchaser agreed to accept a reduced break up fee in the amount of $35,000.00.

28. The Bank of America, which has a claim in excess of $2.8 million secured by a blanket lien on all of the Debtor's assets, agreed to pay half of the reduced break up fee from its portion of the sale proceeds, even though the Stipulation and Order with the Bank requires that the break up fee be funded entirely out of the estate's carve out (15% of the net sales proceeds). Accordingly, rather than having to litigate the enforceability of the break up fee, and upon a possible loss, paying $55,000 out of its portion of the sale proceeds, the estate is liable only for the sum of $17,500, without having to expend any time or legal fees on litigation.

29. As set forth in the Closing Statement, the Trustee issued two checks payable to the Second Purchaser: one in the amount of $35,000.00 for payment of the break up fee, and a second in the sum of $75,000.00 for the return of the Second Purchaser Deposit.

30. In payment and reduction of the Bank's claim, the trustee issued a check payable to the Bank in the amount of $802,083.85, calculated as set forth in the Closing Statement. *See* Exhibit D.

31. The Purchaser prepared a form *Notification of Sale, Transfer or Assignment in Bulk*, which reflected that no sales tax was due on account of the transfer of any of the personal property sold as part of the Restaurant assets. The Purchaser reasoned that no tax was due because the

personal property at the Premises had been rendered worthless for the reasons described above, and the Purchaser was going to have to replace all of the personal property.

32. Copies of all checks exchanged at the closing and the identifications of the signing parties are attached as to Exhibit D.

Dated: New York, New York
June 16, 2011

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP
Attorneys for Alan Nisselson, Chapter 7 Trustee

By: /s/ Alan Nisselson
Alan Nisselson (anisselson@windelsmarx.com)
Leslie S. Barr (lbarr@windelsmarx.com)
156 West 56th Street
New York, New York 10019
(212) 237-1000

## INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | Second Purchaser's Offer and Deposit check |
| **Exhibit B** | Memorandum of Sale executed by the Second Purchaser |
| **Exhibit C** | Purchaser's Memorandum of Sale and Deposit checks |
| **Exhibit D** | Closing Statement with attachments |